[Cite as *State v. Williams*, 2015-Ohio-3968.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140199 |
|  |  | TRIAL NO. B-1201790 |
| Plaintiff-Appellee, | : |  |
|  |  |  |
| vs. | : | *O P I N I O N.* |
|  |  |  |
| ALPHONSO WILLIAMS, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas Court

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: September 30, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela M. Stagnaro*, for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1}   Defendant-appellant Alphonso Williams appeals from his convictions, following a jury trial, for aggravated burglary and the rape of P.H., a then-77-year-old woman.  In 1998, Williams forcibly entered P.H.'s apartment, threatened to kill her if she did not give him money, and then, after she had complied with his demand, raped her vaginally and anally.  This prosecution began in 2011, when a DNA sample obtained from Williams was found to match the DNA in semen found on P.H.'s nightgown after the attack.

{¶2}   Raising five assignments of error, Williams contends that the trial court erred in denying his motion to suppress statements made to police, in admitting an out-of-court declaration from P.H. describing the attack to a sexual-assault nurse, in entering judgment on convictions not supported by sufficient evidence and that were against the manifest weight of the evidence, in adjudicating Williams a sexual predator, and in imposing sentences contrary to law.  We affirm.  But we must remand the case to the trial court so that it can incorporate its consecutive-sentencing findings into the sentencing entry.

### I.   The 1998 Rape of P.H.

{¶3}   Between 6:00 and 7:00 a.m., on the morning of May 3, 1998, Adam Jennings noticed an African-American male standing outside the window of P.H.'s apartment.  Williams is African-American.  Jennings noticed that P.H.'s air conditioning unit was missing from its aperture in the window.  Several minutes later he heard P.H. screaming.  Responding to her calls, Jennings found the frail P.H. disheveled and bleeding.  She was hysterical.  The African-American male had fled.

{¶4}   Cincinnati police officers responded and found P.H. still agitated but able to explain what had happened.  She could not identify her attacker.  Police found broken pieces of the air conditioner on the floor of her apartment.  The mattress had

been shifted from the box spring. The bed coverings were disheveled. Fecal matter was found on the bed. Officers collected P.H.'s nightgown and other clothing as evidence, and transported P.H. and the clothing to University Hospital.

{¶5} At the hospital, P.H. was examined by nurse Mary Jo Lattarulo, a trained sexual-abuse nurse examiner, or SANE nurse. As Lattarulo later explained to the jury, the primary purpose of the SANE program is to diagnose and treat victims of sexual assault. She described how she took a medical history from P.H. and conducted a sexual-assault physical examination.

{¶6} Lattarulo found that P.H. "was just very, very fragile, weak and she was very upset." P.H. was in great pain, and visibly shaking. She cried throughout the examination. She told Lattarulo of a pre-existing heart condition. Although P.H. was not able to tolerate the pain of a complete internal examination, Lattarulo documented the serious injuries that she was able to observe. Lattarulo found a one-inch laceration to P.H.'s fourchette, a fold of skin at the back of the vulva. From the condition of her wounds, Lattarulo concluded that P.H.'s injuries were about 12 hours old, and were consistent with forcible trauma and forced sexual activity. No police officers were present during the examination.

{¶7} As part of the medical record, Lattarulo recorded P.H.'s description of her ordeal:

> [Patient] states that she was breathing funny and noticed that her air conditioner was not on, and at that time she heard a voice. 'Wham bam, like the mountains falling.
>
> I saw a head in the glass and he said shut up and be quiet or I will kill you. Cooperate with me and give me what I want, I won't hurt you, I want your money and something else. If I give you money, will you please go so I won't say a word. I have a heart condition and can't

take much.  I reached into my handbag and gave him the money and when I looked up at him, I saw him start to unbuckle his belt undo his clothes.  I told him please you promised.  He came down on top of me and said, wait a minute.  I am going to take you to the bed.  He put me on the bed.  If you cooperate, it won't be bad, and you might even enjoy it.  He said you let me go into your rectum  like he was mad, like it was my fault because he got shit on him.  He said, I'm going to have to go clean up, I knew better than to leave.  He came back & started again.  He stretched me back on the bed & he started, and if you cooperate, it won't be so long.  I need a quickie.  He was covering my mouth & smothering me.  He got started & it hurt and he said if you make another noise I'll kill you.'  I kept thinking I am going to die. When he got finished the second time he said wasn't it good.  I was trying to save my life.  He went into the bathroom to wash his hands.

{¶8}    The investigation was unable to find P.H.'s attacker.  She died one year later.

### II.   The 2011 CODIS Hit

{¶9}    The case remained dormant until 2011, when William Harry, a Hamilton County serologist and DNA-analyst, reviewed a DNA sample taken from Williams, who was incarcerated in the Ohio Department of Rehabilitation and Correction.  When Harry entered the sample into the Combined DNA Index System ("CODIS"), a national DNA database system, Williams' sample was found to match the DNA of the semen retrieved from P.H.'s nightgown.  Harry obtained a new sample from Williams, conducted a more detailed test, and again determined that the sample matched the DNA recovered from the victim.

{¶10}   Police resumed the investigation.  Cincinnati Police Specialist Jane Noel interviewed Williams in prison and showed him a picture of the victim. Williams denied knowing her.  Williams maintained that "I didn't do it," and that his DNA "shouldn't [have been] there."

### III.  The 2012 Jury Trial

{¶11}   The Hamilton County Grand Jury returned a four-count indictment in 2012.  Williams was charged with one count of aggravated burglary, in violation of R.C. 2911.11(A)(1), one count of vaginal rape, one count of anal rape, both in violation of R.C. 2907.02(A)(2), and a single count of kidnapping.

{¶12}   Williams moved to suppress his statements to Specialist Noel. Following a hearing, the motion was denied.  Williams also filed a motion in limine to prevent Lattarulo from recounting P.H.'s description of the attack to the jury.  The trial court reserved ruling on the motion until Lattarulo was ready to testify at trial. The court conducted a voir dire examination of the witness outside of the hearing of the jury.  After reviewing her testimony, and over the well-argued objection of Williams' counsel, the court permitted Lattarulo to testify.

{¶13}   Williams testified in his own defense.  Contrary to his earlier assertions, Williams testified that he had had a consensual, sexual relationship with P.H. for a six-month period beginning in 1997, when he was 38 years old and she was 77.  He claimed to have given P.H. the nightgown that she had been wearing when she was raped.  Williams denied breaking into her apartment, robbing her, and sexually assaulting her.  Instead he claimed that she had been wearing the nightgown containing his semen the last time that they had had sexual relations.

{¶14}   At the conclusion of five days of testimony, the jury found Williams guilty of each count.  After a sentencing hearing, the trial court imposed ten-year prison terms for the aggravated-burglary offense and for each of the rape offenses.

5

The court afforded Williams the protection of R.C. 2941.25, Ohio's multiple-count statute, by merging, or not imposing a sentence for, the kidnapping offense. The trial court made findings to support its determination that consecutive sentences were appropriate, and imposed an aggregate sentence of 30 years' imprisonment. The trial court also conducted a sexual-predator-classification hearing, and found Williams to be a sexual predator. This appeal ensued.

### IV. Motion to Suppress

{¶15}    In his first assignment of error, Williams contends that the trial court erred in denying his motion to suppress statements made by him, in a recorded interview, to police Specialist Noel and another officer. In the interview, after being shown a photograph of P.H. taken shortly after the attack, Williams denied knowing her. When confronted with the newly developed DNA evidence, Williams stated that "I didn't do it," and that his DNA "shouldn't [have been] there." The recorded interview was ultimately played for the jury at trial.

{¶16}    Williams now argues that, despite his signature on a waiver-of-rights form, he did not voluntarily and knowingly waive his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He asserts that because he was heavily medicated for bipolar mental disorder and depression at the time of the interview, and because Specialist Noel had employed coercive interview techniques, he could not have properly waived that right.

{¶17}    We review a trial court's ruling on a motion to suppress in a two-step process. *See In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 49 et seq. First, we must accept the trial court's findings of historical fact if they are supported by competent, credible evidence. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Then this court must make an independent determination, as a

matter of law, without deference to the trial court's legal conclusions, whether those facts meet the applicable constitutional standards. *See id.*

{¶18} The state bears the burden of demonstrating by a preponderance of the evidence that Williams' statement was voluntary. *See State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 17 (1st Dist.). "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus; *see State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 32. The same considerations apply to whether a defendant voluntarily, knowingly, and intelligently waived his rights. *See Leonard* at ¶ 32. Evidence of police coercion or overreaching is a necessary predicate for a finding of involuntariness. *See State v. Hill*, 64 Ohio St.3d 313, 318, 595 N.E.2d 884 (1992), citing *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶19} At the hearing on Williams' motion to suppress, Specialist Noel testified that she had interrogated Williams at a corrections facility for about 25 minutes on November 2, 2011. Specialist Noel stated that she had advised Williams of his rights against self-incrimination, verbally and in written form, prior to questioning. While Williams explained that he was receiving medication for his mental conditions, Specialist Noel stated that Williams voluntarily spoke to her and the other officer present and appropriately answered questions when asked. The officers did not deny Williams food, drink, or the opportunity to use a bathroom during the brief questioning. Williams himself terminated the interview.

{¶20} There was ample competent, credible evidence adduced at the hearing to support the trial court's legal decision that Williams had been properly advised of his

*Miranda* rights and that he understood those rights when he signed the waiver form. A signed waiver form is strong proof of the validity of the waiver. *See State v. Nields*, 93 Ohio St.3d 6, 19, 752 N.E.2d 859 (2001).

{¶21} There was little evidence of police coercion or overreaching during the brief interrogation. Specialist Noel did lead Williams to believe that P.H. was still alive in hopes that he would assist police in solving the 1998 crime. In light of all the other indications of voluntariness, this interrogation technique standing alone did not vitiate the interview. The trial court opted to believe Specialist Noel's testimony. At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trial court to determine. *See State v. Hill*, 73 Ohio St.3d 433, 446, 653 N.E.2d 271 (1995).

{¶22} Williams was 38 years old when interviewed. He had some mental disorders, but was receiving treatment for them. He had had extensive experience with the criminal justice system. And the interview was a brief, one-time event. Under the totality of the circumstances, we hold that the trial court was justified in finding that Williams had been properly advised of his rights prior to making his statements and that he had knowingly and voluntarily waived those rights. The first assignment of error is overruled.

### V. P.H.'s Nontestimonial Statements Describing the Attack

{¶23} In his second assignment of error, Williams contends that the trial court erred in admitting statements made by P.H. to Lattarulo describing her rape. Lattarulo testified after Williams' carefully argued motion in limine had been overruled, and over his renewed objection.

{¶24} Without an opportunity to confront his victim, an out-of-court declarant, Williams claims he was deprived of his Sixth Amendment rights when Lattarulo testified at trial and related P.H.'s narrative of the attack. *See Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Williams

8

also argues that P.H.'s statements were excludable as hearsay not falling within the medical-records exception of Evid.R. 803(4).

{¶25} The Sixth Amendment to the United States Constitution states, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" Thus the Confrontation Clause bars the "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford* at 53-54.

{¶26} The threshold inquiry is whether the challenged out-of-court statements were testimonial in nature and thus needed to be tested by confrontation. The right to confrontation does not extend to nontestimonial hearsay. Thus if the challenged statements were not testimonial, *Crawford* does not govern their admissibility. *See State v. Lewis*, 1st Dist. Hamilton Nos. C-050989 and C-060010, 2007-Ohio-1485, ¶ 30; *see also Crawford* at 68. Their admissibility is the concern of the Ohio evidence rules. *See Ohio v. Clark*, ____U.S.____, 135 S.Ct. 2173, 2180, 192 L.Ed.2d 306 (2015).

{¶27} While the *Crawford* court declined to "spell out a comprehensive definition of 'testimonial,' " it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. The court noted that these were statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52.

{¶28} In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, the Ohio Supreme Court considered whether out-of-court statements by an adult rape victim to a nurse working in a specialized medical facility for sexual-assault victims were admissible when the victim was not available to testify at trial.

The court adopted the *Crawford* objective-witness test for out-of-court statements made to medical personnel. It concluded that in determining whether a statement is testimonial for confrontation purposes, courts should focus on the expectation of the declarant when making the statement. *See id.* at paragraph two of the syllabus.

{¶29} The statements at issue in *Stahl,* describing the attack and identifying the perpetrator, were made to a medical professional at a medical facility for the primary purpose of receiving medical treatment. They were not made to "investigat[e] past events related to criminal prosecution," because they were the kind of statements that would cause a medical professional to be concerned about the possibility of physical injury, psychological trauma, or disease. *Id.* at ¶ 17 and 46. Thus the rape victim's statements were nontestimonial, because the "victim could reasonably have believed that * * * [her] statement would be used primarily for health-care purposes." *Id.* at ¶ 39-40; *see State v. Ruff*, 2013-Ohio-3234, 996 N.E.2d 513, ¶ 17 (1st Dist.) ("*Ruff I*"), *overruled on other grounds, State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892 (2015).

{¶30} We now review P.H.'s statements to determine whether she could reasonably have believed that they would have been used primarily for health-care purposes, *see Stahl,* 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 39-40, or whether statements not necessary for diagnosis and treatment were related primarily to the state's investigation. *See Ruff I* at ¶ 19-20; *see also State v. Durdin*, 10th Dist. Franklin No. 14AP-249, 2014-Ohio-5759, ¶ 26 et seq.

{¶31} As Lattarulo explained to the jury, her primary role as a SANE nurse was to provide medical care to her patient. While Lattarulo had informed P.H. that she would be collecting evidence, she also explained that primary purpose to P.H. To fulfill her role as a health-care provider, Lattarulo was required to obtain a detailed medical history from P.H. While taking a history, medical professionals routinely record the victim's description of how an injury has occurred in addition to the

physical findings of an examination. Obtaining a thorough history regarding the causation and nature of the injury is an important component of medical diagnosis and treatment. *See Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 27. The victim's statements concerning how the rape occurred can guide medical personnel in diagnosis and treatment. "[T]he description of how the [sexual] assault took place, over how long of a period, how many times a person was hit, choked or penetrated, and what types of objects were inserted are all specifically relevant to medical treatment. They are part of the medical history. They are the reason for the symptoms. They let the examiner know where to examine and what types of injuries could be latent." *State v. Menton*, 7th Dist. Mahoning No. 07 MA 70, 2009-Ohio-4640, ¶ 51.

{¶32} Here, most of P.H.'s statements relayed to the jury dealt with the physical aspects of Williams' attack, including descriptions of the anal and vaginal rapes, and his attempts to smother her. These statements were clearly made for the primary purpose of medical diagnosis and treatment and would have been understood to be so by an objective witness. These statements were nontestimonial. *See Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 39-40; *see also State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 38.

{¶33} But P.H. made other statements to Lattarulo describing Williams' demand for money, his promise that he would not hurt her if she cooperated, and her reaction when he repeatedly raped her after she had given him the money he sought. In *Ruff I*, we posited that "[a]rguably * * * some of the peripheral details provided by [the victim]—that Mr. Ruff demanded money before raping her and had a cigarette and Diet Pepsi afterwards—were testimonial." *Ruff I*, 2013-Ohio-3234, 996 N.E.2d 513, at ¶ 20. But here, unlike in *Ruff I*, P.H.'s statement surrounding Williams' demand for money served a medically relevant purpose. *See Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 46. As Lattarulo explained to the jury,

11

P.H. "was a small woman. And I remember at the time she was – she was very fragile and had a history of some health problems. And I could, you know, tell when I looked at her that she had some chronic problems. And she was just very, very fragile, weak and she was very upset."

{¶34} P.H. suffered from a heart condition. She was extremely agitated some 12 hours after the attack. Lattarulo stated that she needed to inquire about the cause of her anxiety and stress. P.H.'s statements, including recounting Williams' broken promise to leave her unharmed if she cooperated, were medically relevant to explain and assess her agitated state. They are the kind of statements that would cause a medical professional to be concerned about the possibility of physical injury, psychological trauma, or the exacerbation of a chronic disease. *See Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, at ¶ 46. These statements were also made for the primary purpose of medical diagnosis and treatment and would have been understood to be so by an objective witness. *See id.* at ¶ 39-40; *see also Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, at ¶ 38. Although these statements were later used against Williams at trial, the primary purpose behind their making was to obtain a medical diagnosis and treatment. Thus they too were nontestimonial statements.

{¶35} Because P.H.'s statements were not testimonial, we continue our inquiry to determine their admissibility under Evid.R. 803(4), which provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The initial determination of whether a declarant's statements were given for the purpose of medical diagnosis or treatment falls within the sound discretion of the trial court. *See State v. Daniels*, 1st Dist. Hamilton No. C-090566, 2010-Ohio-5258, ¶ 11, citing

*State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 7 (1st Dist.).

{¶36} Because we have already determined that P.H.'s statements were offered for purposes of medical diagnosis and treatment, the trial court's exercise of its discretion exhibited a sound reasoning process that supported its decision. We will not disturb its rulings. *See AAAA Ents., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). The second assignment of error is overruled.

### VI. Sufficiency and Weight-of-the-Evidence Claims

{¶37} In his third assignment of error, Williams challenges the weight and sufficiency of the evidence adduced at trial to support his convictions. He was convicted of a single count of aggravated burglary under R.C. 2911.11(A)(1), which provides: "No person, by force, stealth or deception shall trespass into an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: The offender inflicts, or attempts or threatens to inflict physical harm on another."

{¶38} Williams was also found guilty of two counts of rape under R.C. 2907.02(A)(2). Under this statute the state was required to prove that Williams had engaged in sexual conduct with another when he purposely compelled the other person to submit by force or threat of force. One rape count alleged the sexual conduct consisted of vaginal intercourse, the other of anal intercourse.

{¶39} Our review of the entire record fails to persuade us that the jury, acting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We can find no basis in

this record to conclude that this is that "exceptional case" in which the jury lost its way. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶40} The jury was entitled to reject Williams' explanation, made to the jury at trial, that he had engaged in a consensual sexual relationship with P.H., especially in light of his initial claim that he did not know her when questioned by Specialist Noel. Williams' defense otherwise rested largely on highlighting inconsistencies in the state's case, and noting the lack of identification testimony by eyewitnesses. For example, Williams notes the discrepancy between Lattarulo's assertion that P.H.'s injuries had occurred 12 hours before her mid-day examination and the witnesses' hearing P.H. scream at 6:00 or 7:00 in the morning.

{¶41} The state presented ample evidence to support the convictions, including Lattarulo's testimony relating P.H.'s narrative of the attack, Lattarulo's description of P.H.'s injuries and her agitated state, Jennings' testimony that an African-American male had stood outside P.H.'s window shortly before he heard P.H. screaming on the morning of the attack, and the testimony of the investigating officers. The state also introduced compelling physical evidence that DNA from semen found on P.H.'s nightgown recovered in the 1998 investigation matched Williams' DNA.

{¶42} As the weight to be given the evidence and the credibility of the witnesses were for the jury, sitting as the trier of fact, to determine in resolving conflicts and limitations in the testimony, the jury could reasonably have found that Williams had committed both aggravated burglary and rape after forcibly entering P.H.'s apartment. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶43} When reviewing the legal sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether the evidence could have

convinced any rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. *See State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 36; *see also Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of the witnesses, as both are functions reserved for the trier of fact. *See State v. Campbell*, 195 Ohio App.3d 9, 2011-Ohio-3458, 958 N.E.2d 622 (1st Dist.).

{¶44} Here, the record reflects substantial, credible evidence from which the trier of fact could have reasonably concluded that all elements of the charged crimes had been proved beyond a reasonable doubt, including that Williams had trespassed into P.H.'s apartment by force with purpose to commit a criminal offense and that while doing so he had inflicted physical harm on P.H. All the elements of the rape offenses—that Williams had purposely compelled P.H. to engage in vaginal and anal intercourse by force—had also been proved to the requisite standard. The third assignment of error is overruled.

### *VII. Sexual-Predator Classification*

{¶45} Williams' fourth assignment of error, in which he argues that his sexual-predator classification was contrary to the weight of the evidence, is not well taken. Since Williams committed these sexually oriented offenses prior to January 1, 2008, the classification hearing was held pursuant to the civil and remedial provisions of former R.C. Chapter 2950, also known as "Megan's Law." *See State v. Williams*, 129 Ohio St.3d 344, 2011-Ohio-3374, 952 N.E.2d 1108, ¶ 22.

{¶46} We note that in the past we have applied the some-competent-credible-evidence standard of review, articulated in *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), when reviewing the weight of

evidence adduced to support a sexual-predator classification. *E.g., State v. Hunter*, 144 Ohio App.3d 116, 121, 759 N.E.2d 809 (1st Dist.2001).

{¶47}   In light of the Ohio Supreme Court's decision in *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 16, that the *C.E. Morris* standard improperly blurs distinctions between weight and sufficiency of the evidence in civil proceedings, we now clarify our standard of review.

{¶48}   When reviewing a challenge to the manifest weight of the evidence in civil proceedings such as a sexual-predator-classification hearing under Megan's Law, we apply the standard of review articulated in *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. *See Eastley* at ¶ 14-23; *see also In re A.B.*, 1st Dist. Hamilton Nos. C-150307 and C-150310, 2015-Ohio-3247, ¶ 14-15.   Our review asks whether the evidence satisfies the burden of persuasion, which in this case was a clear-and-convincing standard. *Eastley* at ¶ 12 and 19; *see State v. Eppinger*, 91 Ohio St.3d 158, 163, 743 N.E.2d 881 (2001), citing *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶49}   Here, the trial court conducted the classification hearing in accordance with the dictates of *Eppinger*.   It carefully considered the statutory factors found in former R.C. 2950.09.   The state presented evidence that Williams had been hospitalized for psychiatric illness in the 1970s, that he was already serving a 14-year prison sentence for manslaughter and felonious assault, that he was receiving treatment for a bipolar mental disorder, and that Williams had measured in the high-risk category for sexual recidivism on a Static 99 assessment.   The trial court noted the horrific nature of Williams' sexual conduct in repeatedly raping a frail, older woman.

{¶50}   Based upon our review of the record, we conclude that the trial court had ample evidence before it to produce a firm belief that Williams was "likely to engage in one or more sexually oriented offenses sometime in the future." *See* former

R.C. 2950.01(E); *see also Eppinger* at 162. The trial court could have properly found by clear and convincing evidence that Williams is a sexual predator. *See Eppinger* at 163. Thus, we hold that the trial court did not lose its way and create such a manifest miscarriage of justice that we must reverse its decision and order a new classification hearing. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Williams' fourth assignment of error is overruled.

### *VIII. Sentencing Issues*

{¶51} In his final assignment of error, Williams challenges his sentences for aggravated burglary and rape. The trial court imposed a ten-year prison term for each offense. It informed Williams at the sentencing hearing that the terms would be served consecutively and stated the findings that supported the determination. The trial court also journalized a separate consecutive-sentence-findings worksheet reflecting that the court imposed consecutive terms. But the sentencing entry does not include those consecutive-sentencing findings.

### *a. A Separate Animus for Each Offense*

{¶52} Williams first argues, as he did at the sentencing hearing, that his convictions for vaginal rape, anal rape, and aggravated burglary were allied offenses of similar import subject to merger. Since, he contends, these offenses were committed neither separately nor with a separate animus, the trial court violated the requirements of R.C. 2941.25 by sentencing him for all three offenses. We review the trial court's merger ruling de novo. *See State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶53} In the appeal of our decision in *Ruff I*, the Ohio Supreme Court held that R.C. 2941.25 contemplates an evaluation of "three separate factors—the conduct, the animus, and the import." *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph one of the syllabus. Separate convictions are permitted under R.C.

2941.25 for allied offenses if we answer affirmatively to one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with a separate animus or motivation? *Id.* at paragraph three of the syllabus; *see State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 76. Neither the *Ruff* decision nor "the language of R.C. 2941.25 mandates the order of our inquiry. Thus, we may begin our analysis with any of the three questions. And we may end our analysis upon an affirmative response to any of the three questions." *Bailey* at ¶ 83.

{¶54} We note that the Supreme Court's *Ruff* decision also remanded the case for this court to answer the first inquiry. Thus in *State v. Ruff*, 1st Dist. Hamilton Nos. C-120533 and C-120534, 2015-Ohio-3367, ¶ 23 ("*Ruff II*"), we resolved the issue of whether a trial court violates R.C. 2941.25 by failing to merge each of a defendant's convictions for aggravated burglary, under R.C. 2911.11(A)(1), with the corresponding rape offenses, under R.C. 2907.02(A)(2), where the state relied solely on the rape offenses to establish the physical-harm element of the aggravated burglaries. We answered in the affirmative, because the harm that resulted from the rape of each victim was the same harm that escalated each burglary to aggravated burglary.

{¶55} But in *Ruff II*, the issue remanded to us from the Supreme Court was limited to an inquiry into the import of those offenses. *See id.* at fn. 1. Thus we did not consider the state's contention that the offenses had been committed with a separate animus. Here, that issue is squarely before us. It is raised by the facts of the case. It is a focus of the state's argument in support of the trial court's decision not to afford Williams the protections of the multiple-count statute. And Williams maintains that the two rape offenses and the aggravated-burglary offense were committed with the same animus.

{¶**56**}   We determine the defendant's animus—his immediate motive or purpose—by dissecting the facts and circumstances in evidence, including the means used to commit the offense.   *See State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979); *see also Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, at ¶ 86.

{¶**57**}   It is clear that Williams' immediate motive for breaking into P.H.'s apartment was to commit aggravated burglary by committing a theft offense.   P.H. told Lattarulo that upon entering her home, Williams had first taken her money by threatening violence.   The jury had been instructed that it could find Williams guilty of aggravated burglary if it determined that he had knowingly trespassed in P.H.'s apartment with purpose to commit "rape and/or theft," and had then inflicted physical harm on his victim by raping her.

{¶**58**}   Only after she had complied with his demands for money did he take P.H. to the bed and rape her.   The manner in which Williams viciously and repeatedly raped P.H. demonstrated that he had acted with an animus separate from that of his initial motive in obtaining her money.   Therefore, we hold that the rape offenses and the aggravated-burglary offense were committed with a separate animus and, thus, they were separately punishable under R.C. 2941.25.   *See Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph three of the syllabus. The trial court did not err in failing to merge each rape offense with the aggravated-burglary offense.

{¶**59**}   Finally we review Williams' contention that the two rape offenses should be merged.   But in *State v. Strong*, 1st Dist. Hamilton Nos. C-100484 and C-100486, 2011-Ohio-4947, ¶ 71, this court held that two counts of rape involving different types of sexual activity—vaginal intercourse and digital penetration—were committed separately for purposes of R.C. 2941.25, even though they were committed in the course of the same sexual encounter.   Because the offenses

19

involved different, distinct types of sexual activity, they each constituted a separate crime, and their merger was not required by statute. *Id.*

{**¶60**} Here, the unrebutted testimony of the victim shows that the rape counts involved vaginal intercourse and anal intercourse. These are two distinct types of sexual activity, each constituting a separate crime, for which Williams may be separately punished. The trial court did not err in failing to merge the two rape counts.

### b. Consideration of the Relevant Sentencing Factors

{**¶61**} Williams next asserts that the trial court failed to consider the purposes and principles of sentencing. The trial court must consider the purposes and principles of sentencing before imposing sentence, in accordance with the sentencing statutes, including R.C. 2929.11 and 2929.12. But we will presume that the court considered these statutes, even from a silent record, unless the appellant can demonstrate affirmatively that the court failed to do so. *See State v. Alexander*, 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 24, *overruled sub silentio in part on other grounds, State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659.

{**¶62**} Here, it is clear from the trial court's remarks at the sentencing hearing, and its sentencing-findings worksheet, that it considered the relevant provisions of R.C. 2929.11 and 2929.12 in fashioning Williams' sentences. The court noted Williams' extensive record of prior felony offenses and juvenile delinquencies. It noted that the victim's advanced age exacerbated the harm inflicted on her. And the court observed that Williams had showed no remorse for his deeds.

### c. Consecutive-Sentencing Findings Not in the Sentencing Entry

{**¶63**} We do find merit, however, in Williams' final argument, regarding the trial court's failure to include consecutive-sentencing findings in the sentencing

entry.   The record reflects that the trial court stated the required findings for consecutive sentences during the sentencing hearing and that it journalized a sentencing-findings worksheet that included these findings.  The record of Williams' misdeeds amply supports the trial court's R.C. 2929.14(C)(4) findings.  *See* R.C. 2953.08(G)

{¶64}   But, as the state concedes, the trial court did not incorporate its consecutive-sentencing findings into the sentencing entry as required by *Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, at syllabus.  On the authority of *Bonnell*, we sustain the fifth assignment of error in part.  *See State v. Davis*, 1st Dist. Hamilton No. C-140351, 2015-Ohio-775, ¶ 7-10.  The remainder of the assignment is overruled.

### IX. Conclusion

{¶65}   Having sustained the fifth assignment of error in part, we remand the matter, so that the trial court can correct its failure to incorporate its consecutive-sentencing findings into the sentencing entry by nunc pro tunc entry.  We affirm the trial court's judgment in all other respects.

Judgment accordingly.

**HENDON, P.J.,** and **MOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.